**S & C TRANSPORT CO., INC., a corporation, Appellee,**

v.

**Bo McALISTER, Appellant.**

**No. 46980.**

Court of Appeals of Oklahoma, Division No. 1.

Nov. 5, 1974.

Released for Publication by Court of Appeals Nov. 27, 1974.

Reid K. Mayfield, Atoka, for appellee.

Gary E. Payne, Atoka, for appellant.

BOX, Presiding Judge:

An appeal from a jury verdict in favor of S & C Transport Co., Inc., plaintiff in the trial court, against Bo McAlister, defendant.

Plaintiff filed its action in the District Court for money judgment on four checks, accepted by plaintiff and signed by defendant, which were returned by the bank because of insufficient funds. Plaintiff sought the total amount of $5,065.66.

Defendant answered, denying all allegations, and further answering that "neither is he indebted to nor is he under any comity of contract to have any business transactions with the plaintiff, that the defendant has never received any products as alleged in plaintiff's petition for consideration of said negotiable instruments sued on."

After a trial was had to a jury, a verdict was returned in favor of plaintiff in the amount of $5,065.66.

From the overruling of defendant's Motion for a New Trial, this appeal was lodged.

The facts revealed by plaintiff's evidence are as follows: Mr. J. W. Pitts had been engaged in the feed and grocery business since 1936 and in the feed business since 1945; that he had known defendant Bo McAlister for a number of years; that Mr. Pitts' credit rating had become strained and plaintiff would not continue to transport feed to Pitts except on a cash basis. Pitts and defendant entered into a business arrangement testified to as follows by Pitts:

"Q Have you ever had any business dealings with Mr. McAlister?

A Yes, sir.

Q When did these business dealings start?

A Well this, on this particular deal we had business off and on all the time, but it started along in August of 69 or 70.

Q Well, you talk about this deal; what was this business arrangement?

A Well, the deal was he furnished the money to buy the feed with; I paid him $7.00 a day and let him have his feed at cost; furnished the man to go out and unload it which would amount to anywhere from Three Hundred to Nine Hundred Dollars a month.

Q And at this time, where were you doing business?

A At the old ice plant building.

Q Whose owned the ice plant building?

A Bo McAlister; he said he had given it to his wife.

Q How long did this financial arrangement go on?

A Well, until along in May of 71.

Q During this period of time, could that have been May of 72, Mr. Pitts?

A Yes sir, it could or is.

Q What were the mechanics of this financial arrangement?

A I sell the grain, the merchandise in the store, and give Mr. McAlister the money, the checks, and he was aware that he was behind; I told him he was over Fifteen Thousand Dollars behind himself; he said you think it's that much?

Q Did Mr. McAlister; what did he do or how were these transactions handled?

A  We would given him the checks and he would; at first he was doing business at the Atoka First National Bank; we would given him the checks and he would deposit them; sometimes he would claim I made a mistake, but I had double checked them, and I had checked them off, and he would say such and such a check wasn't in there, and I was in no position to argue with him, but it got to the point where I had to.

Q  What was given for these checks that was given to Mr. McAlester?

A  We would give him the customer's checks, and sometimes we would get them cashed at Johnny Durbin's and the cash would be taken down to the bank at Colbert, Oklahoma.

Q  Was this deposited in Mr. McAlister's account?

A  Yes sir.

Q  Now you sold grain in this manner; how did you purchase it?

A  Well, whatever came along or I would call them and tell them who I was and that he would send his checks; he knew we was doing business with S & C; he was well aware of it.

Q  How long did you do business with S & C?

A  Approximately two years.

Q  And did you give them checks on Bo McAlister?

A  Yes sir . . .

*    *    *    *    *    *

Q  You say you paid for these loads of grain by checks from Bo McAlister?

A  Yes sir.

Q  How long did you say this went on, approximately two years?

A  Yes, approximately two years.

Q  Now calling your attention to these checks given to S & C, who made the checks out?

A  Well, sometimes most of the time I made them out.

Q  What condition were they in when they reached you?

A  They had Bo McAlister's signature; he would come down in the morning; we would give him what money we had, and he would leave the signed checks.

*    *    *    *    *    *

Q  Do you have any idea the total number of checks in this series of transactions given to you by Mr. McAlister and subsequently negotiated to S & C Transport Co.

A  Just off hand I would estimate approximately seventy; that's a wild guess."

All checks previously testified to, except the four involved in this controversy, were paid. Notice was properly given by the plaintiff to defendant regarding the dishonoring of the checks in question. At the close of plaintiff's evidence, defendant's demurrer was overruled. Defendant declined to put on any evidence.

Defendant alleges error as follows:

"PROPOSITION I. The trial court erred in overruling defendant's Motion for New Trial where it clearly appears there is not sufficient material and competent evidence to sustain the verdict rendered plaintiff.

"PROPOSITION II. The court erred in giving instructions contrary to the evidence and which obviously influenced the jury against the defendant and in favor of the plaintiff."

Defendant alleges that as a matter of law and evidence, plaintiff was not a holder in due course. The facts are that no defenses against the position of plaintiff that it was a holder in due course were asserted by way of evidence at the trial.

12A O.S.1971 states the following:

"3–302 Holder in Due Course

"(1) A holder in due course is a holder who takes the instrument

"(a) for value; and

"(b) in good faith; and

"(c) without notice that it is overdue or has been dishonored or of any defense against or claim to it on the part of any person.

"(2) A payee may be a holder in due course.

"§ 3—303 Taking for Value

"A holder takes the instrument for value

"(a) to the extent that the agreed consideration has been performed or that he acquires a security interest in or a lien on the instrument otherwise than by legal process; or

. . . . . .

"(c) when he gives a negotiable instrument for it or makes an irrevocable commitment to a third person.

"§ 3—304 Notice to Purchaser

"(4) Knowledge of the following facts does not itself give the purchaser notice of a defense or claim

. . . . . .

"(c) that any party has signed for accommodation;

"(d) that an incomplete instrument has been completed, unless the purchaser has notice of any improper completion;

"(e) that any person negotiating the instrument is or was a fiduciary;

. . ..

"§ 3—305 Rights of a Holder in Due Course

"To the extent that a holder is a holder in due course he takes the instrument free from

"(1) all claims to it on the part of any person; and

"(2) all defenses of any party to the instrument with whom the holder has not dealt except,

"(a) infancy, to the extent that it is a defense to a simple contract; and

"(b) such other incapacity, or duress, or illegality of the transaction, as renders the obligation of the party a nullity; and

"(c) such misrepresentation as has induced the party to sign the instrument with neither knowledge nor reasonable opportunity to obtain knowledge of its character or its essential terms; and

"(d) discharge in insolvency proceedings; and

"(e) any other discharge of which the holder has notice when he takes the instrument."

Defendant further argues that there was a failure of consideration. The Supreme Court in the case of Gill v. Yoes, Okl., 360 P.2d 506, at page 508 stated:

". . . . It is really immaterial whether the draft was given for the purchase of the plane by either Hobson or the defendant just so long as it was given. We think that Haffner v. First National Bank of Seiling, 152 Okl. 169, 5 P.2d 351, 354, is controlling here and the following language is pertinent:

" 'Where a benefit is conferred on a third party and a detriment is suffered by the payee of a note at the instance of the maker thereof, it will be sufficient "consideration" to support the note, even though the maker thereof received no personal benefit by reason of the execution and delivery thereof." '

The court therein also cited as authority the following: Lacy v. Edwards, 170 Okl. 458, 41 P.2d 64; Rudolph Wurlitzer Co. v. Rossman, 196 Mo.App. 78, 190 S.W. 636; Bond v. Krugg, 115 Okl. 222, 242 P. 559, and Keist v. Cross, 118 Okl. 142, 247 P. 85.

This argument of defendant has no merit.

Defendant's second proposition, to-wit:

"The court erred in giving instructions contrary to the evidence and which obviously influenced the jury against the defendant and in favor of the plaintiff."

This proposition presents a situation that has confronted this Court in an increasing number of instances, to-wit: No Journal Entry, no final order regarding the trial court's rulings on demurrers, no motions

for new trial, and no court's instructions in the record transmitted to this Court. Thus for the purpose of this case and future cases we set out that part of the Court Rules which will hereafter guide this Court, namely, 12 O.S.1971, Ch. 15, App. 2, which provide:

"(e) Duties of clerk on completion of record

"The clerk of the trial court shall:

"I. notify all parties or their counsel when the record on appeal has been completed and is ready for transmission and;

"II. *notify the clerk of this court, on a form furnished by this court, when the record on appeal has been completed for transmission and that all the parties to the action (or their counsel) have been advised in writing to that effect.*" (Emphasis supplied.)

The record reveals that in the instant case the clerk's Notice of Completion of Record was filed with the Supreme Court on February 19, 1974. Further, the Supreme Court called for the record on September 12, 1974, which was transmitted and filed with the Court Clerk on September 17, 1974.

As heretofore set out, the attorneys had notice on February 19, 1974 that the record was ready, but the record was transmitted without any of the trial court's instructions being included therein.

■ We hold that it is incumbent on the attorneys involved to ascertain that the records to be transmitted to the Clerk of the Supreme Court contain all matters specified in their designation of record before same is transmitted to the Clerk of the Supreme Court for review.

■ We therefore hold that attorneys are responsible for what is contained in the record transmitted for appellate review.

■ There being no instructions in the record before this Court we cannot say that the trial court erred in the instructions given to the jury.

For the reasons herein set out, the judgment is affirmed.

Affirmed.

ROMANG, J., concurs.